IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 23, 2009

Charles R. Fulbruge III
Clerk

No. 08-50217

ERNEST LYTLE, Individually and as Representative of the Estate of
Heather Lytle, Deceased

Plaintiff-Appellee

v.

BEXAR COUNTY TEXAS; BEXAR COUNTY SHERIFF'S OFFICE; ROBERT
O'DONNELL, in his Individual Capacity

Defendants-Appellants

Appeal from the United States District Court
for the Western District of Texas

Before SMITH, BARKSDALE, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Bexar County Sheriff's Deputy Robert O'Donnell ("O'Donnell") fired his
sidearm at the rear of a vehicle, striking and killing fifteen-year-old passenger
Heather Lytle. Heather Lytle's father, Ernest Lytle ("Lytle"), brought suit
individually and on behalf of his daughter's estate against Bexar County, the
Bexar County's Sheriff's Office, and O'Donnell, alleging violations of Heather
Lytle's civil rights. O'Donnell moved to dismiss the suit against him on the basis
of qualified immunity. The district court denied this motion, and O'Donnell now
brings this interlocutory appeal. Because genuine issues of material fact
preclude a determination of qualified immunity, we dismiss this appeal.

# I. BACKGROUND

## A. Factual Background

On February 28, 2006, O'Donnell responded to a report that a complainant's ex-boyfriend had made threats of violence against her. The complainant stated that her ex-boyfriend was driving a stolen, primer-grey Ford Taurus. O'Donnell contacted a detective in the county auto theft unit and learned that the ex-boyfriend was a known car thief. O'Donnell also learned that the ex-boyfriend was on bond for charges of felony theft and unlawfully carrying a weapon. O'Donnell later spotted a primer-black Ford Taurus—a possible match to the ex-boyfriend's vehicle—at a known drug location. After the Taurus left the location, O'Donnell began to follow it.

Shortly after O'Donnell began following the Taurus, it changed lanes without signaling. O'Donnell activated his emergency lights in an effort to initiate a traffic stop. Instead of stopping, the Taurus turned right and began to accelerate. O'Donnell activated his siren and pursued the Taurus for a quarter-to-half mile. O'Donnell characterizes the chase as exceeding sixty-five miles per hour, while Lytle asserts that the speed was "well over" the thirty mile per hour speed limit. After this brief chase, the Taurus attempted to make a right turn, but it took the turn too widely and collided with a vehicle in the oncoming lane. The Taurus came to a stop and O'Donnell pulled his police cruiser twelve-to-fifteen feet behind the Taurus. The Taurus then began backing up toward O'Donnell's police cruiser.

The parties dispute what exactly happened next. In any event, sometime after O'Donnell stopped his police cruiser, he twice fired at the rear of the Taurus. Heather Lytle was sitting in the center of the back seat of the vehicle, and one of the shots struck and killed her. After firing, O'Donnell returned to his police cruiser and continued the pursuit. Upon later crashing the Taurus into a car port and fleeing on foot, the driver of the Taurus was apprehended.

## B.    Procedural Background

Lytle brought suit against O'Donnell, Bexar County, and the Bexar County Sheriff's Department, alleging, *inter alia*, that O'Donnell violated Heather Lytle's constitutional rights by unreasonably seizing her in violation of the Fourth Amendment. O'Donnell filed a motion to dismiss on the basis of qualified immunity. Because O'Donnell had referenced material outside the pleadings, the district court treated his motion as one for summary judgment. *See* FED. R. CIV. P. 12(d).

The district court ultimately concluded that a genuine issue of material fact precluded granting summary judgment on qualified immunity. The district court found that the parties genuinely disputed the direction and distance that the Taurus had traveled at the moment O'Donnell fired: O'Donnell asserted that he fired as or immediately after the Taurus backed up toward him, but Lytle contended that the Taurus was three or four houses down the block when O'Donnell fired. The district court indicated that O'Donnell would be entitled to qualified immunity were the facts as he alleged—implying that O'Donnell would not be entitled to qualified immunity were the facts as Lytle alleged—but stated that O'Donnell's entitlement to qualified immunity hinged on the resolution of this factual issue. The district court thus found a genuine issue of material fact that would have to be resolved by the factfinder and denied O'Donnell's motion. O'Donnell filed this interlocutory appeal.

## II.  JURISDICTION AND STANDARD OF REVIEW

"The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine 'to the extent that it turns on an issue of law.'" *Flores v. City of Palacios*, 381 F.3d 391, 393 (5th Cir. 2004) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). Where the district court has determined that genuine issues of material fact preclude a determination of qualified immunity, we have jurisdiction only to

address the legal question of whether the genuinely disputed factual issues are material for the purposes of summary judgment. *See Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000) ("In deciding an interlocutory appeal of a denial of qualified immunity, we can review the *materiality* of any factual disputes, but not their *genuineness*."); *see also Colston v. Barnhart*, 130 F.3d 96, 98 (5th Cir. 1997). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If the determination of qualified immunity would require the resolution of a genuinely disputed fact, then that fact is material and we lack jurisdiction over the appeal. *See Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 483 (5th Cir. 2001) ("[T]he threshold issue is whether the facts the district judge concluded are *genuinely disputed* are also *material*. If they are material, we lack jurisdiction."); *see also Estate of Starks v. Enyart*, 5 F.3d 230, 232–33 (7th Cir. 1993) ("If . . . we cannot decide the qualified immunity question without resolving an issue of disputed fact, then we lack jurisdiction over the question. Therefore, if the record read favorably to the plaintiff supports a version of the facts which would not entitle the defendants to immunity, we will dismiss the interlocutory appeal for lack of jurisdiction." (citation omitted)).

Since we are limited solely to legal questions for this interlocutory appeal, we "are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007) (quotation marks and alteration omitted). "Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity 'must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal.'" *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007) (quoting *Gonzales v. Dallas County*, 249 F.3d 406, 411 (5th Cir. 2001)). If the defendant would still be

entitled to qualified immunity under this view of the facts, then any disputed fact issues are not material, the district court's denial of summary judgment was improper, and we must reverse; otherwise, the disputed factual issues are material and we lack jurisdiction over the appeal.

We therefore adopt Lytle's version of the facts and make all reasonable inferences in his favor for the purposes of this appeal. We assume that after the Taurus made the wide right turn and collided with the car in the oncoming lane, O'Donnell stopped his police cruiser behind it. The Taurus reversed course and began backing up toward O'Donnell's police cruiser in an effort to free itself from the collision. The Taurus then began to drive away and made it three or four houses down the block. At this point, there were no bystanders in the path of the vehicle, and, according to Lytle, neither the Taurus nor any of its occupants posed a threat of harm to O'Donnell or others. When the Taurus was three to four houses down the block, O'Donnell twice fired at it. O'Donnell did not issue a warning before firing and was not aiming for the driver or any other individual inside the Taurus. Although this account leaves several factual gaps, we make all reasonable inferences in Lytle's favor when filling those gaps.

Once we have narrowed the interlocutory appeal solely to issues of law, we review the district court's resolution of these issues de novo. *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008); *Freeman*, 483 F.3d at 410.

## III. DISCUSSION

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity for an alleged constitutional violation, we conduct the two-step analysis of *Saucier v. Katz*, 533 U.S. 194 (2001), *overruled in part by Pearson v. Callahan*, 129 S. Ct. 808 (2009).

5

Although *Saucier*'s rigid "order of battle"—requiring courts to always address the constitutional issue of whether alleged conduct violated the constitution—is now advisory under *Pearson*, our ultimate conclusion that O'Donnell is not entitled to qualified immunity mandates a full *Saucier* inquiry. We therefore first ask the threshold "constitutional violation question" of whether, taking the facts in the light most favorable to the plaintiff, the officer's alleged conduct violated a constitutional right. *Id.* at 201. If we determine that the alleged conduct did not violate a constitutional right, our inquiry ceases because there is no constitutional violation for which the government official would need qualified immunity. *Id.* If, however, the alleged conduct amounts to a constitutional violation, then we ask the "qualified immunity question" of whether the right was clearly established at the time of the conduct. *Id.* Qualified immunity allows for officers to make reasonable mistakes about whether their conduct violates the law, and an officer's mistake is reasonable when there are insufficient indicia that the conduct in question was illegal. *See Freeman*, 483 F.3d at 415. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. If we answer both the constitutional violation and qualified immunity questions affirmatively, the officer is not entitled to qualified immunity.

Allegations that an officer used excessive force in conducting a seizure complicates the *Saucier* inquiry. This complexity stems from having to make two "overlapping objective reasonableness inquir[ies]." *Id.* at 210 (Ginsburg, J., concurring in the judgment). We must first answer the constitutional violation question by determining whether the officer's conduct met the Fourth Amendment's reasonableness requirement, as discussed below. If we find that the officer's conduct was not reasonable under the Fourth Amendment, we must

then answer the qualified immunity question by determining whether the law was sufficiently clear that a reasonable officer would have known that his conduct violated the constitution. In other words, at this second step, we must ask the somewhat convoluted question of whether the law lacked such clarity that it would be reasonable for an officer to erroneously believe that his conduct was reasonable. Despite any seeming similarity between these two questions, they are distinct inquiries under *Saucier*, and we must conduct them both.[*]

We therefore face two questions: (1) whether O'Donnell's alleged conduct violated Heather Lytle's constitutional rights, and if so, (2) whether those rights were clearly established at the time of the shooting. We address each in turn.

## A. The Constitutional Violation

Lytle asserts that O'Donnell used excessive force when he fired at the Taurus, implicating his daughter's Fourth Amendment right to be free from an unreasonable seizure. The parties do not dispute that this claim is governed by the Fourth Amendment's requirement that a seizure be objectively reasonable, *see Graham v. Connor*, 490 U.S. 386, 396–97 (1989), or that Heather Lytle was "seized" within the meaning of the Fourth Amendment when O'Donnell's bullet struck her. The only remaining question, then, is whether O'Donnell's conduct was "objectively reasonable." *See Scott*, 127 S. Ct. at 1776; *Ramirez*, 542 F.3d at 128–29; *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008).

### 1. *Objective Reasonableness*

Assessing the reasonableness of a police officer's use of force involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8

---

[*] The Court in *Pearson* did not address *Saucier*'s other holding that, even in qualified immunity claims involving allegations of excessive force, we must still conduct two separate reasonableness inquiries.

(1985)). This balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We judge the reasonableness of an officer's conduct "objectively," that is, without reference to the subjective intent or motivation that underlies the officer's conduct. *Id.* at 397. We must also look at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. And we must account for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id.* at 396–97.

There are few, if any, bright lines for judging a police officer's use of force; when determining whether an officer's conduct violated the Fourth Amendment, "we must . . . slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 127 S. Ct. at 1777–78; *see also id.* (rejecting "an easy-to-apply legal test in the Fourth Amendment context"). Moreover, the reasonableness of an officer's conduct under the Fourth Amendment is often a question that requires the input of a jury. This is not only because the jury must resolve disputed fact issues but also because the use of juries in such cases strengthens our understanding of Fourth Amendment reasonableness. As the Third Circuit stated in *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999),

> [R]easonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

Our standard of review on this interlocutory appeal—namely, whether a reasonable jury could enter a verdict for the non-moving party—emphasizes the

importance of juries in cases of alleged excessive force. Indeed, we can find no constitutional violation when an officer's conduct, even viewed in the light most favorable to the plaintiff, falls into that category of conduct that is reasonable as a matter of law. In such cases, we would hold that no rational jury could find that the officer acted unreasonably. But in those cases where the officer's conduct is less clear and an assessment of reasonableness mandates a number of factual inferences, the case falls within the province of a jury. Thus, when determining whether the officer's alleged conduct violated the constitutional right to be free from unreasonable seizures, we must remain mindful of the role that the jury can play in this determination.

This approach comports with the Supreme Court's decision in *Scott*. Granted, the *Scott* Court stated that, "[a]t the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [a police officer's] actions . . . is a pure question of law." 127 S. Ct. at 1776 n.8 (citation omitted). Thus, when facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably, we can hold that an officer acted reasonably as a matter of law. *See, e.g.*, *Ramirez*, 542 F.3d at 128–31. But when facts are disputed and significant factual gaps remain that require the court to draw several plaintiff-favorable inferences, our analysis is more tentative. In these cases, we must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff.

What this means for the present interlocutory appeal is that we can only find no constitutional violation if, even under the version of the facts most favorable to Lytle, O'Donnell's conduct was objectively reasonable. In such a case, no rational jury could conclude that O'Donnell violated the Fourth Amendment, and any genuinely disputed fact issues would be thus immaterial

9

because their resolution would not alter the ultimate conclusion. But if a factfinder *could* conclude that O'Donnell violated the constitution, we must move on to the qualified immunity question.

### 2. *O'Donnell's Use of Force*

O'Donnell asserts that his use of force was a reasonable response to the threat of harm that the Taurus posed to himself and the public. He further contends that this threat was ever-present, and thus suggests any dispute over the distance or direction that the Taurus had traveled was necessarily immaterial. In other words, according to O'Donnell, the threat that the Taurus posed was sufficiently grave whether the Taurus was immediately in front of him or four houses down the block. Therefore, O'Donnell argues, even if the disputed factual issues are resolved in favor of the plaintiff, he would still be entitled to qualified immunity, rendering any factual disputes immaterial.

O'Donnell misunderstands the issue, however, to be merely one of distance and direction. Although the district court noted this dispute in denying summary judgment, the remainder of its order reveals that resolution of this disputed fact is essential to determining whether the Taurus posed a threat of harm at the time O'Donnell fired and the reasonableness of any response thereto.

As the district court indicated, if the facts were as O'Donnell alleges—that is, he fired as or immediately after the Taurus was backing up toward him—he would likely be entitled to qualified immunity. This is due to the threat of immediate and severe physical harm that the reversing Taurus likely posed to O'Donnell himself. As discussed below, however, the threat of harm was potentially much different under Lytle's version of the facts. O'Donnell is thus mistaken in asserting that the distance and direction the Taurus traveled are irrelevant *because* the Taurus always posed a threat. They are instead relevant to *whether* the Taurus posed a threat.

Further, because we must look at all of the facts and circumstances relevant to the reasonableness of O'Donnell's conduct, he is mistaken to focus entirely on the threat of harm. Even were we to agree with O'Donnell as to the threat the Taurus posed, we would be remiss not to consider O'Donnell's conduct in response to that threat. It is unclear how firing at the back of a fleeing vehicle some distance away was a reasonable method of addressing the threat. Indeed, there is some evidence in the record that O'Donnell had been previously informed of the potential danger and futility of shooting at a vehicle. Were a jury to accept Lytle's version of the facts, it might very well be troubled by O'Donnell's act of firing his sidearm at the back of a vehicle three or four houses down the block of a residential area when he was unlikely to have a shot at—and apparently was not aiming for—the driver. A jury might also find that O'Donnell's act of firing at a vehicle driving away from him in a residential area posed a risk that the shots might strike an unintended target. Thus, even if we assumed that the Taurus posed a significant threat of harm, a jury could conclude that O'Donnell's conduct in response to that threat was unreasonable. In other words, under the plaintiff's version of the facts, O'Donnell's conduct itself weighs against a conclusion of reasonableness.

Moreover, we agree with the district court that the distance and direction that the Taurus had traveled is essential to determining the extent of the threat that the Taurus actually posed—to both O'Donnell and the public in general—at the time O'Donnell fired. O'Donnell points to several factors that he argues indicate the severity of the threat posed by the vehicle. There was, first, the threat of harm that the Taurus posed to O'Donnell himself as it was backing up toward him. Further, O'Donnell reasonably believed (1) that the driver of the Taurus was the same individual that was on bond for charges of felony theft and unlawfully carrying a weapon, and (2) that the driver was driving a stolen vehicle. O'Donnell also knew that the driver of the Taurus (1) had committed

the felony of fleeing from a police officer, (2) had left a known drug location, (3) had led O'Donnell on a high-speed chase through a residential area with children playing somewhere nearby, (4) had collided with an occupied car while attempting to make a right turn, (5) had refused orders to stop, (6) had reversed the Taurus toward O'Donnell, and (7) was fleeing into the neighborhood.

As a preliminary matter, by the time the Taurus was three or four houses away, a jury could conclude that any immediate threat to O'Donnell had ceased. To be sure, the Taurus might have posed an immediate and significant threat of harm to O'Donnell when it was backing up toward him. But an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. *See Abraham*, 183 F.3d at 294 ("A passing risk to a police officer is not an ongoing license to kill an otherwise unthreatening suspect."); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."); *see also Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). Thus, even were we to assume that shooting at the Taurus was reasonable at the moment it was backing up toward O'Donnell, that does not necessarily make his firing at the vehicle when it was driving away from him equally reasonable.

O'Donnell retorts that the events unfolded so quickly that, even if the vehicle was driving away when he fired, he should not be faulted for failing to recognize that the threat to him had passed. O'Donnell is correct on the law. In *Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007), a police officer who was on foot fired at a vehicle immediately after it struck him. We determined that the vehicle, which had accelerated toward the officer after he had attempted to pull it over, posed such a threat to the officer that the use of deadly force was

objectively reasonable even if the officer had fired immediately after the vehicle struck him. *Id.* We reasoned that the "extremely brief period of time" between when the car accelerated toward and struck the officer and the officer's firing of his weapon was insufficient for the officer to perceive "new information indicating the threat was past." *Id.* Under *Hathaway*'s reasoning—and assuming that the Taurus posed a significant threat of harm to O'Donnell at that time—O'Donnell's conduct might be objectively reasonable if he fired *immediately* after the Taurus had backed up toward him.

Taking the facts in the light most favorable to the plaintiff, however, O'Donnell could have had sufficient time to perceive that any threat to him had passed by the time he fired. Although O'Donnell asserts that the time between the Taurus backing up toward him and the moment he fired was very brief, it was at least enough time for the Taurus to go from a full stop to a distance three or four houses down the block. Depending upon the width of the neighborhood lots and the Taurus's speed and acceleration, this interval could have been anywhere from three to ten seconds, perhaps even more. While the scant record at this point in the proceedings precludes any certainty regarding the amount of time this took, when drawing all reasonable inferences in the plaintiff's favor, we must assume that the Taurus backing up toward O'Donnell and the shooting were not "in near contemporaneity." *Cf. id.* We must therefore infer that sufficient time might have passed for O'Donnell to perceive that the threat to him had ceased. Consequently, a jury could find that there was no threat to O'Donnell at the time of the shooting, and this lack of a threat weighs against a conclusion of reasonableness.

Turning to the other indicia of the threat the Taurus posed to the public in general, O'Donnell asserts that it is only reasonable to conclude that the Taurus was a clear menace. Invoking the Supreme Court's statement in *Scott* that "[a] police officer's attempt to terminate a dangerous high-speed car chase

that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death," 127 S. Ct. at 1779, O'Donnell argues that the threat that the fleeing Taurus posed to the public renders his use of force objectively reasonable.

In *Scott*, the Court held that an officer's use of force to stop a fleeing motorist was reasonable in part because the suspect posed "an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase." *Id.* at 1778. In the words of the Court, the suspect engaged in "a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 1775–76; *see also id.* at 1778 (characterizing the pursuit as a "reckless, high-speed flight" that stretched nearly ten miles). The Court thus concluded that "[t]he car chase that [the suspect] initiated . . . posed a substantial and immediate risk of serious physical injury to others; no reasonable jury could conclude otherwise." *Id.* at 1779. For this reason and others, the Court held that the officer's use of force in *Scott* was objectively reasonable. *Id.*

Although it stated that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death," *id.*, the Court's decision in *Scott* did not declare open season on suspects fleeing in motor vehicles. As Justice Ginsburg pointed out in her concurrence, *Scott* did not "articulat[e] a mechanical, *per se* rule." *Id.* at 1779 (Ginsburg, J., concurring).

> The inquiry described by the Court is situation specific. Among relevant considerations: Were the lives and well-being of others (motorists, pedestrians, police officers) at risk? Was there a safer way, given the time, place, and circumstances, to stop the fleeing vehicle?

*Id.* (citation omitted). Indeed, the reasoning of *Scott* itself—requiring courts to "slosh [their] way through the factbound morass of 'reasonableness,'" *id.* at 1778 (majority opinion)—belies such a *per se* approach. Consequently, the Taurus's flight does not *necessarily* render O'Donnell's conduct objectively reasonable. Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public. As the cases addressing this all-too-common scenario evince, the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable.

For example, in *Cole v. Bone*, 993 F.2d 1328, 1330–31 (8th Cir. 1993), a police officer shot the driver of an eighteen-wheeler after the suspect led police on a fifty-mile chase exceeding speeds of ninety miles per hour, passed traffic on both shoulders, attempted to ram several police cruisers, ran a road block, and forced over one hundred vehicles out of its way. The Eighth Circuit held that the officer's conduct was reasonable because the officer was justified in believing that "the truck posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves." *Id.* at 1333. Similarly, in *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007), the Sixth Circuit found the shooting of a fleeing motorist to be objectively reasonable. After the suspect's vehicle collided with a police cruiser, one officer approached the driver's window and stuck his gun into the vehicle, pointing it at the suspect's head. *Id.* at 484. The suspect began to drive away, knocking the officer to the ground. *Id.* The court in *Williams* found a second officer's shooting of the driver to be objectively reasonable based upon the threat that the driver posed to both the downed officer and the public. *Id.* at 487. And in *Abney v. Coe*, 493 F.3d 412, 418 (4th Cir. 2007), the Fourth Circuit held that an officer's conduct was reasonable where the officer stopped a suspect fleeing on a motorcycle by ramming the suspect with his police cruiser. The court found "abundant and uncontradicted evidence" that the suspect posed a substantial

threat of harm to the public, including the fact that the suspect led police on an eight mile chase during "which he committed numerous dangerous traffic violations" and ran another motorist off the road. *Id.* at 416–17. This threat of harm rendered the officer's conduct objectively reasonable. *Id.* at 418; *see also Long v. Slaton*, 508 F.3d 576, 580–81 (11th Cir. 2007)*, cert. denied*, 129 S. Ct. 725 (2008); *Beshers v. Harrison*, 495 F.3d 1260, 1268 (11th Cir. 2007); *Martin v. Dishong*, 102 F. App'x 780, 782–83 (4th Cir. 2004) (per curiam); *Vanvorous v. Burmeister*, 96 F. App'x 312, 314 (6th Cir. 2004) (per curiam); *Scott v. Clay County*, 205 F.3d 867, 878 (6th Cir. 2000); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

In contrast, a number of courts have found police officers' shooting of fleeing motorists to be unreasonable—or at least potentially so, for the purposes of qualified immunity appeals—where the driver posed a lesser risk of harm to others. For example, in *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007), a suspect had led police on a chase, "largely within the speed limit," for over an hour. An officer twice rammed the suspect's vehicle and later, without warning, shot and killed the suspect as the suspect's vehicle rolled away. *Id.* at 991–92. The Ninth Circuit found it "obvious" that "[n]o officer acting reasonably in these circumstances could have believed that he could use deadly force to apprehend" the suspect. *Id.* at 993–94. Similarly, in *Smith v. Cupp*, 430 F.3d 766, 770 (6th Cir. 2005), a police officer shot a suspect after the suspect had stolen the officer's police cruiser and began to drive away. The Sixth Circuit recognized that a suspect fleeing in a stolen police cruiser posed some danger to the public but held that the danger "was not so grave as to justify the use of deadly force." *Id.* at 773. As the plaintiff's version of the facts did not mention any bystanders "whose physical safety could have been endangered by [the suspect's] actions," *id.* at 774, the court held that a jury would "be entitled to determine that [the police officer's] use of force was unreasonable and accordingly unconstitutional,"

*id.* at 775. And in *Vaughan v. Cox*, 343 F.3d 1323, 1326–27 (11th Cir. 2003), a police officer shot a passenger in a fleeing vehicle after a suspect had led police on a highway chase exceeding eighty miles per hour and had collided with a police cruiser. The Eleventh Circuit found that "[g]enuine issues of material fact remain[ed] as to whether [the suspects'] flight presented an immediate threat of serious harm to [the police officer] or others at the time [the officer] fired the shot." *Id.* at 1330. Since the suspects in *Vaughan* were little more than "suspects who were evading arrest and who had accelerated to eighty to eighty-five miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture, . . . a reasonable jury could find that [the suspects'] escape did not present an immediate threat of serious harm to [the police officer] or others on the road." *Id.*; *see also Tubar v. Clift*, 286 F. App'x 348, 351 (9th Cir. 2008) (mem.); *Kirby v. Duva*, 530 F.3d 475, 482–83 (6th Cir. 2007); *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 346 (6th Cir. 2007); *Jones v. City of Atlanta*, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam); *Sigley v. City of Parma Heights*, 437 F.3d 527, 536 (6th Cir. 2006); *Cowan ex rel. Cooper v. Breen*, 352 F.3d 756, 763 (2d Cir. 2003); *Lewis v. Boucher*, 35 F. App'x 64, 69–70 (4th Cir. 2002) (per curiam); *Ribbey v. Cox*, 222 F.3d 1040, 1043 (8th Cir. 2000); *McCaslin v. Wilkins*, 183 F.3d 775, 779 (8th Cir. 1999); *Abraham*, 183 F.3d at 294–95; *Starks*, 5 F.3d at 233.

As these decisions indicate, a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable. In assessing the reasonableness of a police officer's use of force, we must instead delve into the facts and circumstances of each case.

Taking the facts of the present case in the light most favorable to Lytle, a jury could conclude that the Taurus posed some threat of harm; the chase took place at high speeds within a residential area, there were children playing somewhere nearby, and the Taurus had collided with another vehicle. But we

do not agree with O'Donnell that the Taurus was so menacing under Lytle's version of the facts that any use of force in an attempt to stop it would be objectively reasonable as a matter of law. A jury accepting Lytle's version of the facts could conclude that the Taurus did not pose a sufficient threat of harm such that the use of deadly force was reasonable. O'Donnell had pursued the Taurus for only a quarter-to-half mile before the shooting occurred, raising a question of whether O'Donnell had sufficient indicia to conclude that the Taurus posed such a threat of harm. Also, there were no children or bystanders in the path of the vehicle, indicating that no one was in immediate danger. The Taurus's collision with the oncoming vehicle while making a wide right turn does give us some pause, but we think the jury should assess the depravity that this collision evidenced. Thus, while any threat of harm to the public would weigh in favor of finding O'Donnell's conduct reasonable, the threat was not so great under Lytle's version of the facts that O'Donnell's conduct is beyond question.

When we consider the totality of the circumstances, we conclude that O'Donnell's conduct may not have been objectively reasonable. A rational jury could conclude that the Taurus did not pose an especially significant threat of harm such that the use of deadly force was justified. Further, when weighing the threat of harm posed by the Taurus against O'Donnell's chosen course of conduct—firing at the back of the vehicle from some distance—the jury could conclude that O'Donnell's conduct was not a reasonable response to any threat.

We emphasize this last point: the facts in this interlocutory appeal merely indicate that O'Donnell's conduct is not beyond question. We are holding only that a jury considering all relevant circumstances—O'Donnell's conduct, the threat of harm to O'Donnell and the public, etc.—could determine that O'Donnell acted unreasonably. The meager record at this point of the proceedings has mandated a number of inferences, and the factual assumptions on which we have decided this appeal might bear little resemblance to what the factfinder

ultimately determines. But it is the job of the factfinder, not this court, to ultimately resolve the factual disputes and make the inferences that fill the gaps in the facts. On an interlocutory appeal, we are limited to assuming that any and all questions are resolved in the plaintiff's favor, tempered by the limits of reasonableness. We therefore conclude that a jury could determine that O'Donnell acted unreasonably in firing at the back of the Taurus and thus violated Heather Lytle's constitutional rights. This is sufficient to affirmatively answer the constitutional violation question of our inquiry. We thus turn to the question of whether those rights were clearly established at the time of the incident.

## B. The Clearly Established Right

At the second step of the qualified immunity inquiry, we ask whether the violated constitutional right was clearly established at the time of the violation. When conducting this inquiry, "[t]he central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). "Thus, while the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force employed in a particular situation may not have been clear to a reasonable officer at the scene." *Bush*, 513 F.3d at 502 (citing *Saucier*, 533 U.S. at 201–02).

We need not dwell on this issue. It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others. *See Kirby*, 530 F.3d at 483–84. This

holds as both a general matter, *see Garner*, 471 U.S. at 11–12, and in the more specific context of shooting a suspect fleeing in a motor vehicle, *see, e.g.*, *Kirby*, 530 F.3d at 484; *Vaughan*, 343 F.3d at 1332–33. The right in question was therefore clearly established on February 28, 2006, and this is sufficient to affirmatively answer the qualified immunity question of our inquiry.

We therefore hold that, were a jury to accept Lytle's version of the facts, it could conclude that O'Donnell had violated Heather Lytle's clearly established constitutional right to be free from an unreasonable seizure. Because Lytle's version of disputed facts permits a decision adverse to O'Donnell, the district court was correct to conclude that O'Donnell's entitlement to qualified immunity turns on the resolution of these factual issues. These disputed factual issues are thus material as to whether O'Donnell is entitled to qualified immunity, and we consequently lack jurisdiction over this interlocutory appeal.

## IV. CONCLUSION

We agree with the district court that O'Donnell's entitlement to qualified immunity turns on genuine issues of material fact that the factfinder must resolve. We therefore DISMISS O'Donnell's interlocutory appeal for a lack of jurisdiction.

DISMISSED.

JERRY E. SMITH, Circuit Judge, dissenting:

I respectfully dissent. The majority errs, primarily in light of *Scott v. Harris*, 550 U.S. 372 (2007). The situation faced by the officers in *Scott* and the instant case are not different in any way that should make a difference. *Scott* is the clearly-established law that governs here for purposes of the qualified immunity analysis.

As the majority states, we base our analysis on the facts that are undisputed and on the disputed facts as alleged by the plaintiff. Majority op. at 4-5. The majority admits that Officer O'Donnell "would likely be entitled to qualified immunity" if, as he claims, "he fired as or immediately after the Taurus was backing up toward him." *Id.* at 10. But Lytle contends, to the contrary, that, as the majority describes it, "the Taurus was three or four houses down the block when O'Donnell fired." *Id.* at 3. The question is whether that disputed issue of fact––albeit genuine––is material. *See id.* at 4. It is not.

The majority goes astray in diminishing the importance of the threat to others, including not only the officers but also pedestrians, the occupants of vehicles, and even the occupants of nearby buildings. The majority errs in criticizing the fact that in his brief, O"Donnell "focus[es] entirely on the threat of harm." *Id.* at 11.

In *Scott*, the Court, quite properly, focused on that threat––on what it termed "the extreme danger to human life posed by [the suspect]." *Scott*, 550 U.S. at 695-96. Addressing the statement in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985), that, under the Fourth Amendment, the fleeing suspect must have posed an immediate threat of serious physical harm to the officer or others," the *Scott* Court relied on the fact that "it was [the suspect's] flight itself (by means of a speeding automobile) that posed the threat of 'serious physical harm . . . to others.'" *Scott*, 550 U.S. at 382 n.9 (quoting *Garner*, 471 U.S. at 11).

We return, therefore, to the question whether, accepting Lytle's version of the facts, the threat to life and safety was sufficient to justify use of deadly force. The majority accurately sets forth

> several factors that [O'Donnell] argues indicate the severity of the threat posed by [the suspect's] vehicle. There was, first, the threat of harm that the Taurus posed to O'Donnell himself as it was backing up toward him. Further, O'Donnell reasonably believed (1) that the driver of the Taurus was the same individual that was on bond for charges of felony theft and unlawfully carrying a weapon, and (2) that the driver was driving a stolen vehicle. O'Donnell also knew that the driver of the Taurus (1) had committed the felony of fleeing from a police officer, (2) had left a known drug location, (3) had led O'Donnell on a high-speed chase through a residential area with children playing somewhere nearby, (4) had collided with an occupied car while attempting to make a right turn, (5) had refused orders to stop, (6) had reversed the Taurus toward O'Donnell, and (7) was fleeing into the neighborhood.

Majority op. at 11-12.

For purposes of summary judgment, we cannot credit O'Donnell's disputed claim that the Taurus was backing toward him. The other facts, however, are not contested, and they closely mirror the considerations addressed in *Scott*, in which the Court asked whether,

> consistent with the *Fourth Amendment*, [an officer can] attempt to stop a fleeing motorist from continuing his public-endangering flight . . . . Put another way: Can an officer take actions that place a fleeing motorist at risk of serious injury or death on order to stop the motorist's flight from endangering the lives of innocent bystanders?

*Scott*, 550 U.S. at 374. The Court answered that question in the affirmative:

> Deputy Scott did not violate the *Fourth Amendment*. . . . [The suspect] posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase. . . . A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the *Fourth Amendment*, even

22

when it places the fleeing motorist at risk of serious injury or death.

*Id.* at 381, 384, 386.

The same result is called for here.  It makes no difference if the dangerous suspect was three or four houses away instead of backing toward the officer.  The obvious risk to the public was the same, as was the need for the officer to take action.  The blame for the passenger's death falls squarely on the suspect, not the officer, who had no intention of hitting an innocent occupant of the Taurus with his shot.

Officer O'Donnell did not violate the Fourth Amendment.  We should not ask "whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . after the fact."  *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam). O'Donnell is entitled to qualified immunity, because his "decision was reasonable, even if mistaken."  *Id.* at 229.  His actions, despite their unfortunate and unintended consequences, were not unreasonable.

"[N]o reasonable jury could conclude otherwise."  *Scott*, 550 U.S. at 386. I respectfully dissent.