# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

August 7, 2014

Lyle W. Cayce
Clerk

No. 13-10773

TROY THOMPSON, INDIVIDUALLY, AND AS HEIR TO THE ESTATE OF KEITH THOMPSON; TERESA THOMPSON, INDIVIDUALLY, AND AS HEIR TO THE ESTATE OF KEITH THOMPSON,

Plaintiffs-Appellants,

v.

SHERIFF IRA A. MERCER; PALO PINTO COUNTY, TEXAS

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, SMITH, and BENAVIDES, Circuit Judges.

FORTUNATO P. BENAVIDES, Circuit Judge:

Keith Thompson ("Keith") was killed when Palo Pinto County Sheriff Ira Mercer ended a two-hour high-speed chase by firing an assault rifle into the vehicle Keith had stolen. Keith's parents ("the Thompsons") brought the present action against Mercer and the County pursuant to state law and 42 U.S.C. § 1983, alleging that Mercer used excessive force in apprehending the suspect. The district court granted the defendants' joint motion for summary judgment after granting qualified immunity to Mercer and declining to exercise supplemental jurisdiction over any remaining state claims. The Thompsons filed timely appeal.

No. 13-10773

We review summary judgment *de novo*, applying the same standard as the district court. *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011). Summary judgment is appropriate where the record and evidence, taken in the light most favorable to the non-moving party, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Ibid.* (quoting Fed. R. Civ. P. 56(a)). In making this determination, "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, --- U.S. ----, 134 S. Ct. 1861, 1863 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A public official is entitled to qualified immunity unless his conduct violates constitutional law that was "clearly established at the time of the defendant's actions." *Freeman v. Gore*, 483 F.3d 404, 411 (5th Cir. 2007) (citations omitted). Because we conclude that there was no constitutional violation in Mercer's use of deadly force, we affirm the district court's decision.

## I.

"The first step in assessing the constitutionality of [Mercer's] actions is to determine the relevant facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Review of the record reveals virtually no dispute as to the material facts. Much of the incident, including its unfortunate conclusion, was recorded by video cameras. Although courts must construe evidence in light most favorable to the nonmoving party, we will not adopt a plaintiff's characterization of the facts where unaltered video evidence contradicts that account. *Id.* at 381.

2

No. 13-10773

The incident occurred on Sunday, December 18, 2011, from approximately 6:45 to 8:50 in the morning.[1] It is undisputed that Keith stole a vehicle, kidnapped its sleeping occupant, and then fled for two hours at speeds in excess of 100 miles per hour. The kidnapping victim—who was later released—furtively dialed 911, allowing dispatchers to overhear Keith state that he would "kill himself" when he "got to where he was going." The victim also revealed that there was a firearm in the vehicle. While in flight, Thompson ignored traffic laws, did not yield to law enforcement, and was at one point pursued by six vehicles representing four different law enforcement units. Officers made multiple attempts to disable Keith's vehicle, all of which failed. Sheriff Mercer did not participate in the pursuit, but was kept apprised of developments and was aware of these facts.

It is equally uncontested that Sheriff Mercer laid in wait with a semi-automatic "AR-15" assault rifle on the shoulder of FM 4, a rural road running between the towns of Lone Camp and Santo, Texas. He did not position his cruiser as a barricade or employ any device that might have disabled Keith's vehicle. When the vehicle came into view, Mercer fired into its hood, striking the radiator. Mercer believed he had hit the radiator, but the vehicle did not appear to slow down.[2] Mercer then aimed directly into the windshield, striking Mercer three times in the head and neck after firing a total of twelve rounds. The vehicle passed within three or four yards of Mercer. Mercer concedes that

---

[1] The court order inadvertently lists the date as December 17, 2011. *See Thompson v. Mercer*, No. 4:12-cv-099-Y, slip op. at 1 (N.D. Tex. June 25, 2013) [hereinafter referred to as "slip op."].

[2] The Thompsons allege that Mercer must have known he had hit the radiator because a "white cloud of steam" "poured from beneath [the] hood," but the video indicates that this only occurred after the vehicle collided with a stock pool.

there were no bystanders in the area, and that he had seen no traffic in the vicinity.

The briefs reveal only one plausible factual dispute: the parties disagree as to how many third parties were endangered by Keith's flight. Mercer emphasizes the inherently dangerous nature of the driving, and points to the passing cars seen in the video recordings. The Thompsons argue that—irrespective of how many third parties had already safely bypassed the chase—their son never actually hurt anyone and was driving in an empty rural area at the time he was shot. They contend that on a Sunday morning it was particularly unlikely that additional driving would endanger anyone, and thus that Mercer's conduct was objectively unreasonable.

The Thompsons did not dispute any other facts before the district court, but instead objected to "all of the evidence" as "bias[ed]" and "irrelevant and prejudicial." Slip op. at 5. The district court overruled those objections, *ibid.*, and the Thompsons do not appeal that decision.

## II.

After reviewing the record and the relevant law, we conclude that the court correctly awarded summary judgment to the defendants. We begin with the § 1983 claim against Sheriff Mercer. Even construing the facts in favor of the Thompsons, it seems clear that Mercer acted within the bounds of the Constitution, and is entitled to qualified immunity even if we assume that he did not. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken

judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd*, --- U.S. ----, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  In order to overcome a qualified immunity defense, a plaintiff must allege a violation of a constitutional right, and then must show that "the right was clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. 223.  Courts may address these two elements in either order, and need not proceed to the second where the first is resolved in the negative.  *See Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 409–10 (5th Cir. 2009) (citing *Pearson*, 555 U.S. at 201).

## A.

The district court correctly concluded that the Thompsons have not alleged a constitutional violation.  A plaintiff does not overcome qualified immunity by merely alleging "that a violation *arguably* occurred." *Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1212 (5th Cir. 1989) (emphasis original). "Rather, the court must be certain that if the facts alleged by plaintiff are true, notwithstanding any credibility disputes with defendants, *then* a violation has clearly occurred." *Ibid*. (emphasis original).  Here, even construing the facts in the Thompsons' favor, there was no Fourth Amendment violation.

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV.  It is undisputed that the apprehension of Keith Thompson by deadly force was a seizure. Therefore, to prevail on their excessive force claim, the Thompsons need only show that the use of deadly force was excessive, and "that the excessiveness of the force was unreasonable." *Carnaby*, 636 F.3d at 187 (citing *Freeman*, 483 F.3d at 416).  In making that argument, the Thompsons recognize that "'[u]se

of deadly force is not unreasonable when an officer would have reason to believe the suspect poses a threat of serious harm to the officer or others.'" *Id.* at 188 (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)) (alteration original). They dispute whether the requisite threat of serious harm existed at the time Keith was killed. We find that it did.

In *Scott v. Harris*, the Supreme Court addressed the extent of reasonable force in the context of law enforcement's need to curtail vehicular flight. *See generally* 550 U.S. 372. Officer Scott ended a high-speed chase by using his police cruiser to bump the suspect's vehicle. *Id.* at 376. The ensuing collision rendered that suspect a paraplegic. *Ibid.* Even so, the Supreme Court ultimately rejected the suspect's allegations of excessive force, holding that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.* at 386. In so holding, the Court established the framework by which courts should evaluate the reasonableness of the force used:

> In determining the reasonableness of the manner in which a seizure is effected, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). . . . [I]n judging whether Scott's actions were reasonable, *we must consider the risk of bodily harm that Scott's actions posed to respondent in light of the threat to the public that Scott was trying to eliminate.* . . . We think it appropriate in this process to take into account not only the number of lives at risk, but also their relative culpability. It was respondent, after all, who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that Scott confronted. Multiple police cars, with blue lights flashing and sirens blaring, had been chasing respondent for nearly 10 miles, but he ignored their warning to

stop.  By contrast, those who might have been harmed had Scott not taken the action he did were entirely innocent.  We have little difficulty in concluding it was reasonable for Scott to take the action that he did.

*Id.* at 383–84 (citation formatting revised) (emphasis added).  This court has clarified that "*Scott* did not declare open season on suspects fleeing in motor vehicles" in that "the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable." *Lytle*, 560 at 414, 415.

Applying these standards to the facts at hand, it seems clear that Mercer's use of deadly force was justified.  There is no doubt that firing the assault rifle directly into the truck created a significant—even certain—risk of critical injury to Keith.  Under these circumstances, however, the risk was outweighed by "the extreme danger to human life posed by" reckless vehicular flight.  *Scott*, 550 U.S. at 383.  In fact, even the Thompsons concede that their son represented a grave risk when he "reached speeds exceeding 100 miles per hour on the interstate, when he ran numerous stop signs, when he had 'recklessly' driven on the wrong side of the road, [and] when he avoided some road spikes [and] took officers down Blue Flat Road where a horse was loose." Indeed, parts of the police camera footage might be mistaken for a video game reel, with Keith disregarding every traffic law, passing other motorists on the left, on the right, on the shoulder, and on the median.  He occasionally drove off the road altogether and used other abrupt maneuvers to try to lose his pursuers.  The truck was airborne at least twice, with Keith struggling to regain control of the vehicle.  In short, Keith showed a shocking disregard for the welfare of passersby and of the pursuing law enforcement officers.

Upon reflection it seems that Keith—who was in possession of a firearm and had committed multiple felonies over the course of two hours—posed a significantly greater threat than the *Scott* suspect, an unarmed driver

suspected only of speeding in a pursuit that lasted less than six minutes. So if the *Scott* chase "closely resemble[d] a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury," *id*. at 380, the chase here posed all the greater risk. Accordingly, after multiple other attempts to disable the vehicle failed, it was not unreasonable for Mercer to turn to deadly force to "terminate [the] dangerous high-speed car chase." *Id*. at 386.

The Thompsons disagree, arguing that their son was no longer a risk because he was driving on a "lonely" rural road and his vehicle had already been disabled. The argument is not persuasive. The Supreme Court has already rejected the defense that "the roads were mostly empty." *Scott*, 550 U.S. at 378. Similarly, this court recognizes the "inherent danger" of vehicular flight, "even when no bystanders or other motorists are immediately present." *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 580 (5th Cir. 2009). But more importantly, the Thompsons' characterization of the scene is belied by the video evidence. Even when Keith was driving along this "virtually empty" country road, multiple cars had to pull over as Keith and his pursuit caravan raced back toward town. And rather than decreasing the inherent risk, the rural nature of the road made the pursuit all the more dangerous, as there was no shoulder for cars to pull onto, and visibility was often limited.

Nor did the district court err in assuming that continued pursuit might endanger "potential drivers" farther up the road. The Thompsons characterize any such finding as purely "speculative," arguing that there is no evidence that any other motorists were "up ahead" on the road. This assertion is also belied by the video. Even after Keith's vehicle was disabled, several more cars are seen driving back toward the interstate. The occupants of those vehicles would have been in immediate danger if Keith had been allowed to continue on his

8

reckless driving spree.  The Thompsons contend that the existence of these motorists is irrelevant to the present inquiry because Mercer was not aware of their presence.  *Id*. at 26.  The argument is unavailing.  Mercer testified that he knew there might be other travelers on the road, and governing standards allow law enforcement and the courts to take into account passersby that "might have been present."  *Scott*, 550 U.S. at 384.

Any suggestion that the threat to the officers had already passed is equally unpersuasive.  The Thompsons contend that Mercer's decision was unreasonable at the time it was made because Keith's "truck didn't pose a sufficient threat of harm, especially after Mercer had struck the radiator with three bullets . . . ."  But the Thompsons' argument counterfactually presumes that Keith was only a threat to the extent that the truck was operational.  Yet the truck was not the only deadly weapon at Keith's disposal.  On the contrary, it is undisputed that he was in possession of a stolen firearm and that Mercer was aware of that fact.  No one knows whether Keith had any intention of using the gun, but assume for the purposes of summary judgment that he did not.  Even so, Mercer had no way of ascertaining Keith's intent, and there was no visible sign of surrender.  Given that this unidentified suspect was admittedly suicidal and had already acted with utter desperation in attempting to evade law enforcement, Mercer was justified in assuming that there was an ongoing "threat of serious harm to the officer or others," even if Keith's vehicle was already disabled.  *Carnaby*, 636 F.3d at 188; *see also Plumhoff v. Rickard*, --- U.S. ----, 134 S. Ct. 2012, 2022 (2014) (rejecting argument that officer's firing of 15 rounds constituted excessive force because "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended").

No. 13-10773

The Thompsons nevertheless contend that—to whatever extent law enforcement was in danger—the officers created that danger by trying to intercept Keith's vehicle.  The argument is wholly without merit.  This court has consistently rejected similar reasoning.  *E.g.*, *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992) (rejecting argument that officers would not have been in danger if they had acted differently).  The question is not whether "the force would have been avoided" if law enforcement had followed some other "police procedures."  *Id.* at 1275–76 (quoting *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir. 1985), *reh'g denied*, 778 F.2d 790 (5th Cir. 1985)).  Instead, "regardless of what had transpired up until the shooting itself," the question is whether "the officer [had] reason to believe, at that moment, that there was a threat of physical harm."  *Id.* at 1276.  As already explained, the requisite threat was present here.  Ultimately, it was Keith—not the officers—"who intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice" that Sheriff Mercer had to make.  *Scott*, 550 U.S. at 384.

Finally, there is little merit in the Thompsons' assertion that law enforcement was constitutionally required to continue lesser efforts to disable the vehicle.  Officers from three agencies had already tried to intercept and disable the vehicle four times.  They tried to deploy stop sticks on the interstate, and a deputy later fired a shotgun at Keith's tires.  These attempts were unsuccessful in part because officers had to remain mindful of the welfare of the pursuing officers and other motorists.  The record suggests that Sheriff Mercer was the last one who could intercept Keith's vehicle before he headed into the town of Lone Camp, which the Thompsons describe as "approximately a mile" away.  It seems clear that law enforcement reasonably attempted alternate means of seizure before resorting to deadly force.  Given the

10

circumstances and the egregious nature of Keith Thompson's flight, there was no Fourth Amendment violation in that decision.

### B.

Even assuming *arguendo* that Mercer's use of force was excessive under the Fourth Amendment, that decision was not so unreasonable so as to deprive him of qualified immunity from § 1983 liability.  To overcome the defense, the Thompsons must allege an infraction so egregious that "no reasonable officer" could have believed the conduct constitutional.  *See Mendenhall v. Riser*, 213 F.3d 226, 231 (5th Cir. 2000) (articulating standard before finding defendant entitled to qualified immunity), *reh'g denied*, 226 F.3d 645 (5th Cir. 2000), *and cert. denied*, 531 U.S. 1071 (2001).  Consider, then, the circumstances facing the officer here.  Mercer knew that this unidentified suspect had stolen a car and abducted a woman.  He also knew that the pursuit had lasted for two hours, and that attempts to disable the vehicle had failed.  He had been told that the suspect was armed and suicidal, and he saw that the suspect was headed toward a town a mile away.  It was therefore manifestly reasonable for law enforcement to assume that the unknown suspect represented a tremendous risk to the officers and to the community that lay ahead.  *See Martinez v. Maverick Cnty.*, 507 F. App'x 446, 449 (5th Cir. 2013) (per curiam) (finding use of deadly force reasonable as a matter of law where woman's "erratic attempts to flee" from a routine traffic stop "posed a threat of serious harm to [officers] and the surrounding community," and where earlier attempts to disable vehicle had failed), *cert. denied*, 133 S. Ct. (2013).  Thus, even if the force was excessive, that force was not *so* excessive that "no reasonable officer" would have thought the conduct constitutional. *Mendenhall*, 213 F.3d at 231.

11

Moreover, a plaintiff must identify a "particular right" so clearly established that the official had fair notice of that right and its concomitant legal obligations. *Camreta v. Greene*, --- U.S. ----, 131 S. Ct. 2020, 2031 (2011). This right must be articulated "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. In other words, "the contours of the right" must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Here, the Thompsons seem to concede the lack of clarity with respect to the use of deadly force in apprehending a fugitive whose vehicle may have already been disabled. In fact, they explicitly ask this court to "sharpen the contours" of relevant doctrine, and they admit that "*Scott* does not provide a firm foundation" regarding "the use of deadly force per se in this case." We agree with the Thompsons that—at the very least—the relevant law is not so well developed as to clearly establish a violation here. And it is for that very reason that Mercer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201.

Yet the Thompsons ask the court to submit this case to a jury, arguing that such an outcome is required by *Lytle*, 560 F.3d at 404. The case is inapposite. *Lytle* was submitted to a jury for resolution of multiple outstanding issues of fact. *Id.* at 407, 418. The case involved the pursuit of a serial carjacker who was driving a stolen vehicle. *Id.* at 407. After a brief chase, the suspect's vehicle collided with a parked car, interrupting the flight. *Ibid.* When the suspect unexpectedly resumed driving, the pursuing officer fired two shots into the rear of the vehicle, striking and killing a child sitting in the back seat. *Id.* at 408. There was no video of the pursuit, and it was unclear from the record whether the suspect was resuming flight, whether he was moving toward the officer, and whether the officer had endangered third parties by

firing the weapon in a residential area. *Id.* at 412–13. As a consequence, the district court found it impossible to determine whether the officer's conduct had been reasonable. *Id.* at 418. Upon interlocutory review this court agreed that the outstanding factual questions should be resolved by a jury. *Ibid.* In the present case, the plaintiffs have identified no analogous material dispute to submit to a jury. As already explained, the uncontested facts reveal that the Thompsons have not overcome Mercer's qualified immunity defense. Accordingly, the district court correctly concluded that Mercer is entitled to qualified immunity as a matter of law. *See Scott*, 550 U.S. at 381 n.8 (explaining that where the material facts are beyond dispute, the reasonableness of the official's use of force is "a pure question of law").

### III.

The only remaining question is whether the district court properly granted summary judgment in favor of the County. The claim against Palo Pinto County does not meet the federal pleading standard, and the deficiency cannot be remedied by further amendment. A complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To state a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must allege "that there was either an official policy or an unofficial custom, adopted by the municipality, that was the moving force behind the claimed constitutional violation." *Duvall v. Dallas Cnty.*, 631 F.3d 203, 209 (5th Cir. 2011) (per curiam) (citing *Monell v. Dep't of Soc. Serv. Of City of N.Y.*, 436 U.S. 658, 694 (1978)), *cert. denied*, 132 S. Ct. 111 (2011). Here, as already explained, there was no constitutional violation. Moreover, neither the complaint nor the amended complaint makes any mention of such a policy or custom. The claim against the County was therefore properly dismissed. Fed. R. Civ. P. 12(b)(6).

The Thompsons, however, argue that they could not effectively oppose summary judgment because they were "denied" discovery on this issue. That assertion is contradicted by the record. Although the summary judgment motion unambiguously moved for dismissal of the claims against the County, the Thompsons' Rule 56 discovery request did not mention the County at all. *See id.* 56(d) (allowing discretionary pre-summary-judgment discovery where non-moving party "cannot present facts essential" to opposition). The court, in fact, granted every one of the Thompsons' specific discovery requests, and can hardly be faulted for failing to grant a request that was never made. Moreover, the Thompsons deposed Sheriff Mercer, and could presumably have asked him about County policy if they had wished to do so. Regardless, because there was no constitutional violation, further discovery would not have forestalled the dismissal of the claims against the County.

## IV.

For the reasons stated herein, we conclude that there was no Fourth Amendment violation in the seizure of Keith Thompson. The Thompsons' § 1983 claims against Mercer and the County therefore fail as a matter of law, and the Thompsons have not appealed the district court's treatment of their state claims. Accordingly, while we are not unsympathetic to the Thompsons' loss of their son, we AFFIRM summary judgment in favor of the defendants.