**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**FILED**

August 28, 2014

Lyle W. Cayce
Clerk

No. 13-10899

BEATRICE LUNA, Individually and as Representative of the Estate of Israel Leija, Jr.; CHRISTINA MARIE FLORES, as Next Friend of J.L. and J.L., Minor Children,

Plaintiffs - Appellees

v.

CHADRIN LEE MULLENIX, In His Individual Capacity,

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before KING, HAYNES, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:

This § 1983 excessive use of force case arises from the shooting and death of Israel Leija, Jr. by Texas Department of Public Safety (DPS) Trooper Chadrin Mullenix during a high-speed pursuit. The district court denied Mullenix's motion for summary judgment on the issue of qualified immunity, holding that multiple genuine disputes of material fact existed as to the qualified immunity analysis. We affirm.

## I.  Factual and Procedural Background

On March 23, 2010, at approximately 10:21 p.m., Sergeant Randy Baker of the Tulia Police Department followed Israel Leija, Jr. to a Sonic Drive-In to

No. 13-10899

arrest him on a motion to revoke misdemeanor probation. The arrest warrant had been filed because (1) Leija had failed to complete all of his hours of community service, and (2) a new complaint of domestic violence had been filed against Leija, who was on probation. After some discussion with Baker, Leija fled the scene and headed north towards Interstate Highway 27 ("I-27"), with Baker in pursuit. Texas DPS Trooper Gabriel Rodriguez was on patrol nearby and took the lead in the pursuit. Around mile marker 77, Leija entered I-27 and continued north, with Rodriguez directly behind him. During the approximately 18 minutes that the pursuit lasted, Rodriguez followed Leija and captured the pursuit on his video recorder. The video supports the plaintiffs' assertions that although the pursuit proceeded north on 1-27 at speeds between 80 and 110 miles per hour, traffic on the dry roadway was light; Leija remained on the paved portion of the road with his headlights on, did not run any vehicles off the road, did not collide with any vehicles, and did not cause any collisions; there were no pedestrians or stopped vehicles along the road; and all of the pursuit occurred in rural areas, without businesses or residences near the interstate, which was divided by a wide center median.

As the pursuit headed north on I-27, other law enforcement units joined. Officer Troy Ducheneaux of the Canyon Police Department deployed tire spikes underneath the overpass at Cemetery Road and I-27. DPS Troopers set up spikes at McCormick Road, north of Cemetery Road. Other police units set up spikes at an additional location further north, for a total of three spike locations ahead of the pursuit. The record reflects that officers had received training on the deployment of spikes, and had been trained to take a protective position while deploying spikes, if possible, so as to minimize the risk posed by the passing driver.

No. 13-10899

During the pursuit, Leija twice called the Tulia Police Dispatch on his cell phone, claiming that he had a gun, and that he would shoot at police officers if they did not cease the pursuit.  This information was relayed to all officers involved.  It was discovered later that Leija had no weapon in his possession.

DPS Trooper Chadrin Mullenix was on patrol thirty miles north of the pursuit, and also responded.  Mullenix went to the Cemetery Road overpass, initially intending to set up spikes at that location, but ultimately decided to attempt to disable the car by shooting it.  He positioned his vehicle atop the Cemetery Road bridge, twenty feet above I-27, intending to shoot at the vehicle as it approached.  Mullenix planned to use his .223 caliber M-4 rifle to disable the vehicle by shooting at its engine block, although he had never attempted that before and had never seen it done before.  The district court noted that "[t]here is no evidence—one way or another—that any attempt to shoot out an engine block moving at 80 mph could possibly have been successful."  Mullenix testified that he had been trained in shooting upwards at moving objects, specifically clay pigeons, with a shotgun.  He had no training on how to shoot at a moving vehicle to disable it.

Mullenix's dash cam video reflects that once he got to the Cemetery Road overpass, he waited for about three minutes for the pursuit to arrive.  Mullenix relayed to Officer Rodriguez that he was thinking about setting up with a rifle on the bridge.  Rodriguez replied "10-4," told Mullenix where the pursuit was, and that Leija had slowed down to 80 miles per hour.  Mullenix then asked the Amarillo DPS dispatch to contact DPS Sergeant Byrd, Mullenix's supervisor, to tell Byrd that he was thinking about shooting the car and to ask whether the sergeant thought that was "worth doing."  According to plaintiffs' allegations, he contacted Byrd to "request permission" to fire at the vehicle.

Mullenix denies that he requested or needed "permission," but stated that he "asked for what [Byrd] advised" and asked to "get his advice." Mullenix did not wait for a response from Sergeant Byrd, but exited his patrol vehicle, took out his rifle, and took a shooting position on the bridge. During this time, the dispatcher relayed a response from Sergeant Byrd to "stand by" and "see if the spikes work first." Mullenix alleges that he was unable to hear that instruction because he had failed to turn on his outside loudspeakers, thereby placing himself out of communication with his dispatch or other officers involved in the pursuit. Plaintiffs allege that since the trunk was open, Mullenix should have heard the response. Mullenix did have his radio microphone on him. During the waiting minutes, Mullenix had a short, casual conversation with Randall County Sheriff's Deputy Tom Shipman about whether he could shoot the vehicle to disable it. When Shipman mentioned to Mullenix that there was another officer beneath the overpass, Mullenix replied that he did not think he would hit that officer.

As the two vehicles approached, Mullenix fired six rounds at Leija's car. There were no streetlights or ambient lighting. It was dark. Mullenix admitted he could not discern the number of people in Leija's vehicle, whether there were passengers, or what anyone in the car was doing. Mullenix testified that at the time of the shooting, he was not sure who was below the overpass, whether Ducheneaux had actually set up spikes there, or where Ducheneaux was positioned beneath the overpass. After Mullenix fired, Leija's car continued north, engaged the spike strip, hit the median and rolled two and a half times. In the aftermath of the shooting, Mullenix remarked to his supervisor, Sergeant Byrd, "How's that for proactive?" Mullenix had been in a counseling session earlier that same day, during which Byrd intimated that Mullenix was not being proactive enough as a Trooper.

4

No. 13-10899

Leija was pronounced dead soon after the shooting. The cause of death was later determined to be one of the shots fired by Mullenix that had struck Leija in the neck. The evidence indicates that at least four of Mullenix's six shots struck Leija's upper body, and no evidence indicates that Mullenix hit the vehicle's radiator, hood or engine block.

The incident was investigated by Texas Ranger Jay Foster. Foster concluded that Mullenix complied with DPS policy and Texas law. The DPS Firearms Discharge Review board reviewed the shooting and concluded that Mullenix complied with DPS policy and Texas law. A grand jury declined to return an indictment of Mullenix. A DPS Office of the Inspector General ("OIG") Report concluded the opposite, that Mullenix was not justified and acted recklessly. The parties disputed the relevance and admissibility of that OIG report, which was subsequently called into question by its author, who testified that he did not have full information on the incident or investigation when he wrote the report. The district court mentioned the report in its statement of facts, but did not further discuss the report.

Beatrice Luna, as the representative of Leija's estate, and Christina Flores, on behalf of Leija's minor child, sued DPS, the Director of DPS Steve McCraw, Trooper Rodriguez, and Trooper Mullenix, in state court, asserting claims under the Texas Tort Claims Act and 42 U.S.C. § 1983. Defendants removed to federal court. Director McCraw's Motion to Dismiss was granted, and plaintiffs' stipulation of dismissal against DPS and Trooper Rodriguez was granted with prejudice. The sole remaining claim is the § 1983 claim against Mullenix, alleging that he subjected Leija to an unconstitutional use of excessive force in violation of the Fourth Amendment. Mullenix answered and asserted the defense of qualified immunity. After discovery, Mullenix moved for summary judgment on the issue of qualified immunity. On August 7, 2013,

No. 13-10899

the district court issued a memorandum opinion and order denying Mullenix's motion for summary judgment.  Mullenix appeals.

## II.  Discussion

The doctrine of qualified immunity shields "government officials performing discretionary functions. . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In reviewing a motion for summary judgment based on qualified immunity, we undertake a two-step analysis.  First, we ask whether the facts, taken in the light most favorable to the plaintiff, show the officer's conduct violated a federal constitutional or statutory right.  *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865 (2014); *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Second, we ask "whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores*, 381 F.3d at 395 (internal quotation marks omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see Tolan,* 134 S. Ct. at 1866.  We may examine these two factors in any order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (overruling in part *Saucier v. Katz,* 553 U.S. 194 (2001)).  Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *Lytle v. Bexar Cnty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).  As the Supreme Court has recently reaffirmed, "in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 134 S. Ct. at 1863 (internal quotation marks and alteration omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Our jurisdiction to review a denial of a motion for summary judgment based on qualified immunity is limited to legal questions. *See, e.g., Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). Because of this jurisdictional limitation, "we consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment." *Id.* at 348; *see Flores*, 381 F.3d at 394. We review the objective reasonableness of the defendant government official's actions and the scope of clearly established law de novo. *See Flores*, 381 F.3d at 394. We "may review the district court's conclusion that issues of fact are material, but not the conclusion that those issues of fact are genuine." *Id.*

### A.    *Constitutional Violation*

Under the first prong of the qualified immunity analysis, the plaintiffs must produce facts sufficient to show that Mullenix's actions violated Leija's Fourth Amendment rights. *Tolan*, 134 S. Ct. at 1865; *Flores*, 381 F.3d at 395. "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). To show a violation, the plaintiffs must produce facts sufficient to show that Leija suffered (1) an injury; (2) which resulted directly from a use of force that was clearly excessive to the need; and (3) the force used was objectively unreasonable. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000). "This is an objective standard: 'the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Ramirez v. Knoulton,* 542 F.3d 124, 128-29 (5th Cir. 2008) (quoting *Graham*, 490 U.S. at 396).

No. 13-10899

"There are few, if any, bright lines for judging a police officer's use of force; when determining whether an officer's conduct violated the Fourth Amendment, we must slosh our way through the factbound morass of reasonableness." *Lytle*, 560 F.3d at 411 (internal quotation marks and alteration omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 383 (2007)). "To gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case." *Flores*, 381 F.3d at 399. "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9; *see Flores*, 381 F.3d at 399. Balanced against this intrusion are "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Lytle*, 560 F.3d at 411.

When deadly force is used, it is clear that the severity and immediacy of the threat of harm to officers or others are paramount to the reasonableness analysis. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2021 (2014) (concluding that deadly force was objectively reasonable where "it is beyond serious dispute that Rickard's flight posed a grave public safety risk"); *Scott*, 550 U.S. at 386 (noting that the use of deadly force was objectively reasonable when "[t]he car chase that respondent initiated in this case posed a substantial and immediate risk of serious physical injury to others"); *see also Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer . . . the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."); *Thompson v. Mercer*, --- F.3d ---, 2014 WL 3882460, at *5 (5th Cir. Aug. 7, 2014) (noting that "the question is whether the officer had reason to

8

believe, at that moment, that there was a threat of physical harm"); *Hathaway v. Bazany*, 507 F.3d 312, 320 (5th Cir. 2007) (noting that the "reasonableness of an officer's use of deadly force is. . . determined by the existence of a credible, serious threat to the physical safety of the officer or to those in the vicinity"); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001) ("The excessive force inquiry is confined to whether the Trooper was in danger at the moment of the threat that resulted in the Trooper's shooting Bazan."); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) ("Genuine issues of material fact remain as to whether [the suspects'] flight presented an immediate threat of serious harm to [the police officer] or others at the time [the officer] fired the shot.").

With regard to high-speed chases, the Supreme Court has held that "[a] police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Scott*, 550 U.S. at 386; *see also Plumhoff*, 134 S. Ct. at 2021-22 (applying *Scott* to a case involving the shooting of a suspect in a high-speed chase). Likewise, this court has recently held that a sheriff who used an assault rifle to intentionally shoot a fleeing suspect as he approached in a truck, after a lengthy, dangerous chase, did not violate the Fourth Amendment. *Thompson*, 2014 WL 3882460, at *4-5. These cases, however, do not establish a bright-line rule; "a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable." *Lytle*, 560 F.3d at 416. Instead, *Scott*, *Plumhoff* and *Thompson* are simply applications of the Fourth Amendment's reasonableness requirement to particular facts. *See Plumhoff*, 134 S. Ct. at 2020-22; *Scott*, 550 U.S. at 382-83; *Thompson*, 2014 WL 3882460, at *4-5. "Nearly any suspect

fleeing in a motor vehicle poses some threat of harm to the public. As the cases addressing this all-too-common scenario evince, the real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable." *Lytle*, 560 F.3d at 415; *see Thompson*, 2014 WL 3882460, at *4.

Mullenix asserts that his use of force was objectively reasonable as a matter of law because he acted to protect other officers, including Officer Ducheneaux beneath the overpass and officers located further north up the road, as well as any motorists who might have been located further north. However, the district court found that, "As to the existence of an immediate risk of serious injury or death to other officers or to innocent bystanders, the summary judgment evidence in this case presents genuine issues of material fact as to whether that risk did, or did not, exist." We agree. The immediacy of the risk posed by Leija is a disputed fact that a reasonable jury could find either in the plaintiffs' favor or in the officer's favor, precluding us from concluding that Mullenix acted objectively reasonably as a matter of law. *See Scott*, 550 U.S. at 380 (explaining that whether the driver "was driving in such fashion as to endanger human life" was a "factual issue"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that the "inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying [the appropriate] evidentiary standard could reasonably find for either the plaintiff or the defendant").

On this record, the risk posed by Leija's flight is disputed and debatable, and a reasonable jury could conclude that Leija was not posing a "substantial and immediate risk" at the time of the shooting. *Scott*, 550 U.S. at 386. Many of the facts surrounding Leija's flight from police, viewed in the light most favorable to the plaintiffs, negate the risk factors central to the reasonableness findings in cases like *Scott*, *Plumhoff* and *Thompson*. According to the

10

No. 13-10899

plaintiffs' version of the facts, although Leija was clearly speeding excessively at some times during the pursuit, traffic in the rural area was light.  There were no pedestrians, no businesses and no residences along the highway, and Leija ran no other cars off the road and engaged no police vehicles.  Further, there is evidence showing that Leija had slowed to about 80 miles per hour prior to the shooting.  Spike systems which could have ended the pursuit with non-lethal means had already been prepared in three locations ahead of the pursuit.  In *Scott* and *Plumhoff*, on the other hand, multiple other methods of stopping the suspect through non-lethal means had failed, the suspects were traveling on busy roads, had forced multiple other drivers off the road, had caused collisions with officers or innocent bystanders, and at the time of the shooting were indisputably posing an immediate threat to bystanders or other officers in the vicinity.  *See Plumhoff*, 134 S. Ct. at 2017-18, 2021-22; *Scott*, 550 U.S. at 379-80, 383-84.  Likewise, in *Thompson*, this court found that the officers had tried "four times" to stop the chase with non-lethal methods, before resorting to deadly force to stop a driver who posed "extreme danger to human life." *Thompson*, 2014 WL 3882460, at \*4, \*6.  The *Thompson* court explained that

> even the Thompsons concede that their son represented a grave risk when he "reached speeds exceeding 100 miles per hour on the interstate, when he ran numerous stop signs, when he had 'recklessly' driven on the wrong side of the road, [and] when he avoided some road spikes [and] took officers down Blue Flat Road where a horse was loose." Indeed, parts of the police camera footage might be mistaken for a video game reel, with Keith disregarding every traffic law, passing other motorists on the left, on the right, on the shoulder, and on the median. He occasionally drove off the road altogether and used other abrupt maneuvers to try to lose his pursuers.  The truck was airborne at least twice, with Keith struggling to regain control of the vehicle.  In short,

11

Keith showed a shocking disregard for the welfare of passersby and of the pursuing law enforcement officers.

*Id.* at *4.

To the extent that we must view facts in accordance with the video, *see Scott*, 550 U.S. at 378-80; *Thompson*, 2014 WL 3882460, at *4, the video supports the plaintiffs' version of the facts. In *Scott*, the plaintiff argued that the force used was unreasonable because the driver posed "little, if any actual threat to pedestrians or other motorists." *Id*. at 378. However, the Court said,

> [t]he videotape tells quite a different story. There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up. Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury.

*Id*. at 379-80. The Court relied on the video to resolve disputed facts, holding that the video "blatantly contradicted" the plaintiff's version of the facts, "so that no reasonable jury could believe it." *Id*. at 380. Likewise, in *Thompson*, the plaintiffs argued that the threat posed by the chase had ended because the rural road was empty by the time of the shooting, but this court found that "the Thompsons' characterization of the scene is belied by the video evidence," which showed multiple cars pulling over to avoid the chase, and dangerous conditions on the road, which had limited visibility and no shoulder for cars to pull onto. *Thompson*, 2014 WL 3882460, at *4. Here, however, the video supports the plaintiffs' assertions that during the pursuit, traffic on the divided

highway was light, there were no pedestrians, businesses or residences along the highway, and Leija ran no other cars off the road and did not engage any police vehicles, such that a reasonable jury could find that Leija's driving did not pose an immediate danger to other officers or drivers.

Further, in concluding that the use of force was reasonable, the *Thompson* opinion relies repeatedly on the fact that the officers had made four attempts to disable the vehicle with non-lethal methods before resorting to deadly force. *Thompson*, 2014 WL 3882460, at *4, *6. With regard to the existence of a Fourth Amendment violation, the holding of *Thompson* is that "after multiple other attempts to disable the vehicle failed, it was not unreasonable for Mercer to turn to deadly force to terminate the dangerous high-speed chase." *Id.* at *4. The opinion later similarly concludes that "law enforcement reasonably attempted alternate means of seizure before resorting to deadly force," *id.* at 6, and discusses this fact twice in its discussion of whether the law was sufficiently clearly established, *id.* In the instant case, there were spikes already in place under the bridge, and officers prepared to deploy spikes in two additional locations up the road. Yet Mullenix fired his rifle at Leija's vehicle before Leija had encountered any of the spikes. In contrast to *Thompson*, the non-lethal methods that were already prepared were never given a chance to work.

We certainly do not discount Leija's threats to shoot officers, which he made to the Tulia dispatcher and which were relayed to Mullenix and other officers. However, this fact is not sufficient, as a matter of law, to establish that Leija posed an immediate risk of harm at the time of the shooting. Under the plaintiffs' version of the facts and viewing all inferences in the light most favorable to the plaintiffs, a reasonable jury could still conclude that there was not a sufficiently immediate threat to justify deadly force. In a case involving

the shooting of a suspect, we have stated that the "core issue" is "whether the officer reasonably perceived an immediate threat." *Reyes v. Bridgwater*, 362 F. App'x 403, 408 (5th Cir. 2010). "[T]he focus of the inquiry is the act that led the officer to discharge his weapon." *Id.* at 406 (internal quotation marks and alteration omitted) (quoting *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)); *see also Bazan*, 246 F.3d at 493 ("The excessive force inquiry is confined to whether the Trooper was in danger at the moment of the threat that resulted in the Trooper's shooting."). The factual scenario here is substantially different, in terms of the imminence and immediacy of the risk of harm, from situations where we have granted qualified immunity to officers who shot an armed suspect, or a suspect believed to be armed. *See Ramirez*, 542 F.3d at 127, 129 (suspect stopped by the side of the road after a brief chase displayed a gun, repeatedly ignored police commands, was located yards from police officers, and brought his hands together in a manner that indicated he may have been reaching for the gun, prompting officer to shoot him); *Ballard v. Burton*, 444 F.3d 391, 402-03 (5th Cir. 2006) (mentally disturbed suspect "refused to put down his rifle, discharged the rifle into the air several times while near officers, and pointed it in the general direction of law enforcement officers"); *Reese v. Anderson*, 926 F.2d 494, 500-01 (5th Cir. 1991) (suspect stopped after a high-speed chase refused to exit the car, refused to follow police commands, repeatedly raised and lowered his hands, turned away from the officer and reached lower toward the floorboard, prompting the officer to shoot him); *compare Reyes*, 362 F. App'x at 407 (fact issue precluded qualified immunity where suspect was armed with a knife, but made no threatening gesture or motion), *with Harris v. Serpas*, 745 F.3d 767, 773 (5th Cir. 2014) (qualified immunity granted to officer where video confirmed that suspect "was standing up out of bed and had raised the knife above his head at the time the

14

shots were fired"). We discuss these cases not because we hold that an officer must actually see a weapon before taking action to protect himself or others from the suspect, but because they illustrate that, even when a weapon is present, the threat must be sufficiently imminent at the moment of the shooting to justify deadly force.

In *Thompson*, the court did note the existence of a stolen gun in the car of the fleeing suspect as a fact that supported its conclusion that the suspect posed an "ongoing threat of serious harm," even though the officer had no way of ascertaining whether the suspect intended to use the weapon. *Thompson*, 2014 WL 3882460, at *5 (quotation omitted). However, in *Thompson*, the officer also knew at the time of the shooting that the suspect was fleeing in a stolen car with a stolen weapon, had abducted a woman during his flight, and that the "unidentified suspect was admittedly suicidal and had already acted with utter desperation in attempting to evade law enforcement." *Id.* at *5, 6. Thus, the court found that the officer was "justified in assuming" that the presence of the stolen weapon contributed to the continuing threat posed by suspect. *Id.* at *5.

Here, although Leija had stated to the dispatcher that he was armed and would shoot officers, he was not fleeing the scene of a violent crime, no weapon was ever seen, and at the time of the shooting, most officers and bystanders were miles away, where they would not have been encountered until after the spikes were given a chance to stop the chase. On appeal, Mullenix relies heavily on the presence of Ducheneaux beneath the overpass, and the risk that Leija could shoot Ducheneaux as he sped by. However, he also testified that he did not actually know Ducheneaux's position or what he was doing beneath

the overpass.[1]    Mullenix argues that he knew that an officer had to be positioned near a roadway to deploy spikes, but the facts, taken in the light most favorable to the plaintiffs, also show that officers were trained to deploy spikes in a location where they were able to take a protective position, that there were several pillars at the Cemetery Road overpass and that Ducheneaux had positioned himself behind a pillar as he was trained to do. Further, just prior to the shooting, Sheriff's Deputy Shipman mentioned Ducheneaux's presence beneath the overpass, and Mullenix replied only that he did not think *he* would hit Mullenix; he did not indicate that he perceived a threat to Ducheneaux from Leija.  In this situation, a jury could conclude Mullenix did not reasonably perceive an immediate threat at the time of the shooting, sufficient to justify the use of deadly force.

The plaintiffs also point to evidence showing that Mullenix heard the warning that Leija had said he had a gun six minutes before the shooting, and went to the bridge and waited three minutes for Leija's car to approach. During this period Mullenix had time to consider his approach, including time to ask for his supervisor's opinion, inform Rodriguez of his intentions, and discuss the feasibility of shooting the car with Shipman.  Plaintiffs argue that this is not the type of "split-second judgment" that officers must make when faced with an imminent risk of harm to themselves or others. *See Plumhoff*, 134 S. Ct. at 2020; *Graham*, 490 U.S. at 396-97; *Hathaway*, 507 F.3d at 320-21.  Although Mullenix relies heavily on the assertion that it is up to the "officer

---

[1] We do not hold that an officer must necessarily have another officer that he believes to be in danger in his sightline at the time he takes action.  We merely state that, given his position atop a bridge in the dark of night, and given all the circumstances of this particular case, a reasonable jury could conclude that Mullenix lacked sufficient knowledge to determine whether or not Ducheneaux was in immediate danger from Leija, or whether Mullenix's own actions were decreasing the risk to Ducheneaux.

on the scene" to make judgments about the use of deadly force, Mullenix was not the only, or even the primary, officer on the scene. Officer Rodriguez was immediately in pursuit of Leija, and multiple other officers from various law enforcement agencies were on the scene at Cemetery Road and were at multiple locations further north along I-27, planning to deploy tire spikes to stop the suspect. There is no evidence that any other officer from any of the law enforcement agencies involved in the pursuit, hearing the same information that Mullenix heard, including the information regarding Leija's threats, decided that deadly force was necessary or warranted. Further, via the dispatcher, Mullenix asked his supervisor, Sergeant Byrd, about his plan to shoot at the car. It is undisputed that Sergeant Byrd advised Mullenix to "stand by" and "see if the spikes work first." While there is a dispute of fact about whether Mullenix heard the instruction to "stand by," Byrd's response certainly bears on the question of whether Mullenix acted unreasonably. Lastly, Mullenix testified that he intended to shoot the engine block of the car in an attempt to disable it, although there is no evidence that shooting at the engine is a feasible method of immediately disabling a car. His justification for the use of force was to disable the car, but non-lethal methods were already in place to achieve the same goal, undermining the asserted necessity for deadly force at that particular instant.

We conclude that whether Leija was posing a substantial and immediate risk of danger to other officers or bystanders, sufficient to justify the use of deadly force at the time of the shooting, is a disputed fact, and we must draw all inferences in favor of the plaintiff. Based on the evidence in the record, a jury could find that a reasonable officer would have concluded that the risk Leija posed was not sufficiently immediate so as to justify deadly force, and that the non-lethal methods already in place could stop the chase without the

need for deadly force. We thus cannot conclude that Mullenix's actions were objectively reasonable as a matter of law. *See Vaughan*, 343 F.3d at 1330 (denying a motion for summary judgment on the grounds of qualified immunity when "[g]enuine issues of material fact remain[ed] as to whether [the suspects'] flight presented an immediate threat of serious harm to [the police officer] or others at the time [the officer] fired the shot"). [2]

### B.    *Clearly Established Law*

Under the second prong of the qualified immunity analysis, plaintiffs must show that Mullenix's actions violated a constitutional right that was sufficiently clearly established. *Flores*, 381 F.3d at 395. For a right to be clearly established, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "The central concept [of the test] is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney*, 367 F.3d at 350 (quoting *Hope*, 536 U.S. at 740). Further, while the Supreme Court has stated that "courts should define the 'clearly established' right at issue on the

---

[2] We of course agree with the dissent that once the relevant facts are determined and all factual inferences are drawn in favor of the non-moving party to the extent supportable by the record, the question of whether the officer acted objectively unreasonably is one of law. *See Scott*, 550 U.S. at 381 n.8. Here, however, there are underlying questions of fact, including the immediacy of the risk and whether Mullenix heard his supervisor's direction to "stand by" and "see if the spikes work first."

basis of the 'specific context of the case,'" it has also recently reminded us that we "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Tolan*, 134 S. Ct. at 1866 (quoting *Saucier*, 533 U.S. at 201).

While Mullenix devotes the bulk of his argument to this prong of the qualified immunity analysis, "We need not dwell on this issue. It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Lytle*, 560 F.3d at 417. "This holds as both a general matter and in the more specific context of shooting a suspect fleeing in a motor vehicle." *Id*. at 417-18 (internal citations omitted) (citing *Kirby v. Duva*, 530 F.3d 475, 484 (6th Cir. 2008); *Vaughan,* 343 F.3d at 1332-33); *see also Sanchez v. Fraley*, 376 F. App'x 449, 452-53 (5th Cir. 2010) (holding that "it was clearly established well before [April 23, 2007] that deadly force violates the Fourth Amendment unless the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," and "the threat of serious harm must be immediate"); *Reyes*, 362 F. App'x at 406 ("Unlike some areas of constitutional law, the question of when deadly force is appropriate—and the concomitant conclusion that deadly force is or is not excessive—is well-established.").

Mullenix points to the Supreme Court's recent decision in *Plumhoff* to argue that the law was not clearly established. The *Plumhoff* Court relied primarily on *Brosseau*, which held that as of 1999 it was not clearly established that it was objectively unreasonable force "to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight." *Brosseau,* 543 U.S. at 195-97, 200. However,

No. 13-10899

*Plumhoff* holds only that where a fleeing suspect "indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby," a police officer's use of deadly force is not clearly established as unreasonable. *Plumhoff*, 134 S. Ct at 2021-22, 2023; *see Brosseau*, 543 U.S. at 200. It does not, however, undermine the clearly established law that an officer may not use deadly force against a fleeing suspect absent a sufficient risk to officers or bystanders. *See Lytle*, 560 F.3d at 417-18. *Thompson* is no different. Similar to *Plumhoff*, it holds that the officer's use of force to stop a high-speed chase was not clearly established as unreasonable where the fleeing suspect had stolen a car and kidnapped a woman, had evaded four attempts to stop the car with non-lethal force, and whose driving continued to pose a "tremendous risk" to the public and other officers. *Thompson*, 2014 WL 3882460, at *6.

At the time of this incident, the law was clearly established such that a reasonable officer would have known that the use of deadly force, absent a substantial and immediate threat, violated the Fourth Amendment. Because on this record, the immediacy of the risk posed by Leija cannot be resolved as a matter of law at the summary judgment stage, we affirm the district court's denial of qualified immunity.[3]

### III.  Conclusion

For the foregoing reasons, we AFFIRM the denial of summary judgment.

---

[3] Mullenix makes a separate argument that the district court relied on inadmissible summary judgment evidence, specifically the OIG report concluding that Mullenix's actions were not justified. This report was later called into question by its author, who testified that it was not based on a full review of the incident. However, there is no indication in the district court's order that it relied on the OIG report in denying summary judgment, and we likewise do not rely on it. If there are questions as to its admissibility, the district court can resolve those in due course as the litigation proceeds.

No. 13-10899

KING, Circuit Judge, dissenting:

I respectfully dissent from the majority's decision to affirm the district court's denial of qualified immunity to Chandrin Mullenix.  The majority's decision conflicts, in several respects, with Supreme Court precedent and our court's recent decision in *Thompson v. Mercer*, No. 13-10773, 2014 WL 3882460, --- F.3d --- (5th Cir. 2014).  While it is a jury's responsibility to resolve material fact disputes, because no such fact dispute is present here, it is our responsibility as judges to decide whether Mullenix acted objectively unreasonably under the Fourth Amendment.  Based on my review of the record, I conclude that Mullenix's use of force was not objectively unreasonable because the threat Israel Leija, Jr. posed to nearby officers, viewed in light of his culpability for that threat, was sufficiently grave to justify the use of a gun to shoot at Leija's vehicle.

The majority opinion is replete with the uncontradicted facts.  It nevertheless purports to identify a single factual dispute precluding summary judgment, explaining: "whether Leija was posing a substantial and immediate risk of danger to other officers or bystanders, sufficient to justify the use of deadly force at the time of the shooting, is a disputed fact, and we must draw all inferences in favor of the plaintiff."  But the "fact issue" referenced by the majority—and referred to a jury—is simply a restatement of the objective reasonableness test that applies to Fourth Amendment excessive force claims. As the Supreme Court and our circuit have held, the application of that test is a legal question to be decided by a judge.

In *Scott v. Harris*, decided in 2007, the Supreme Court explained, "[a]t the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [an officer]'s actions . . . is a

21

pure question of law." 550 U.S. 372, 381 n.8 (2007) (internal citations and emphasis omitted). In clarifying this point, the Court was responding to Justice Stevens's argument, in dissent, that "[w]hether a person's actions have risen to a level warranting deadly force is a question of fact best reserved for a jury." *Id.* at 395 (Stevens, J., dissenting).

This approach accords with our circuit's longstanding view that, under the Fourth Amendment, the determination of the reasonableness of a seizure is a conclusion of law. *See, e.g.*, *Jimenez v. Wood Cnty.*, 621 F.3d 372, 376 (5th Cir. 2010), *aff'd en banc*, 660 F.3d 841 (5th Cir. 2011); *see also White v. Balderama*, 153 F.3d 237, 241 (5th Cir. 1998) ("While it is true that the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application and that proper application of the Fourth Amendment objective reasonableness test requires careful attention to the facts and circumstances of each case, the ultimate determination of Fourth Amendment objective reasonableness is a question of law." (internal quotation marks, citations, and brackets omitted)). More recently, in *Thompson*, we cited *Scott* and rejected the plaintiffs' contention in that case that the question of reasonableness must be submitted to a jury. 2014 WL 3882460, at *7 (citing *Scott*, 550 U.S. at 381 n.8).

In spite of *Scott* and our circuit's precedent, the majority—without actually identifying any disputed facts—repeatedly suggests that fact disputes remain. The majority's conclusion that summary judgment is inappropriate appears to be based on its belief that jurors could draw different "inferences," albeit based on the *undisputed* summary judgment evidence, about the reasonableness of Mullenix's actions. But the majority confuses factual inferences, which are for a jury to make, with legal conclusions, which are committed to a judge. *See Crowell v. Shell Oil Co.*, 541 F.3d 295, 309 (5th Cir.

2008) ("A court is not required to draw legal inferences in the non-movant's favor on summary judgment review."). The majority points to a number of undisputed facts, such as the absence of heavy traffic near Leija, that might weigh against a conclusion that the risk Leija posed justified the level of force used by Mullenix. That the question whether Mullenix's actions in this case were objectively reasonable is, in the majority's wording, "debatable," however, does not transform what otherwise would be a legal question into a factual question precluding summary judgment. *Cf. Gould v. Davis*, 165 F.3d 265, 269 (4th Cir. 1998) ("While the district court is correct that different facts in evidence could be used to support different conclusions as to whether the officers deserve qualified immunity, this does not indicate a *factual* dispute, but rather, a question of law. The district court's order does not point to disputed questions of fact, but rather, disputed legal inferences that could be drawn from what is an undisputed factual record.").

The majority further cites to several decisions in support of its argument that this case should be sent to a jury. In these decisions, however, the courts identified concrete factual disputes precluding summary judgment. *See Tolan v. Cotton*, --- U.S. ---, ---, 134 S. Ct. 1861, 1868 (2014) (holding that there were fact disputes "with regard to the lighting, [the plaintiff's] mother's demeanor, whether he shouted words that were an overt threat, and his positioning during the shooting"); *Vaughan v. Cox*, 343 F.3d 1323, 1330 (11th Cir. 2003) (holding that there were factual disputes as to whether the suspect intentionally rammed a police vehicle and whether the suspect made aggressive moves immediately before the officer fired); *see also Scott*, 550 U.S. at 380 (explaining that whether the driver "was driving in such fashion as to endanger human life" was a "factual *issue*," but that there was no genuine factual *dispute* in that case (emphasis added)); *Lytle v. Bexar Cnty.,* 560 F.3d

404, 412–13 (5th Cir. 2009) (concluding that the direction and distance that the suspect's car was traveling at the moment the officer fired were disputed). No such disputed facts are present here. Accordingly, regardless of whether Mullenix's use of force was reasonable, as I believe, or excessive, this case is ripe to be decided in this appeal.

Given this, I turn next to the primary question presented here: whether, resolving any genuine fact issues[1] and drawing all factual inferences in the plaintiffs' favor, Mullenix's use of force against Leija was objectively unreasonable, as a matter of law, under the Fourth Amendment. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, --- U.S. ---, ---, 131 S. Ct. 2074, 2085 (2011) (internal quotation marks and citation omitted). The Supreme Court has explained that, in applying Fourth Amendment standards, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. O'Connor*, 490 U.S. 386, 396–97 (1989). Whether the force used was reasonable is determined "from the perspective of a reasonable officer on the scene, rather

---

[1] As I see it, the sole disputed fact in this case is whether Mullenix heard the message relayed from his superior, Sergeant Byrd, that he should "stand by" and "see if the spikes work first." But this fact issue, though genuine, is not material. The uncontradicted testimony of Byrd and other officers was that, under department policy, it was the responsibility of the "officer on the scene" to make judgments about the use of force. Furthermore, Sergeant Byrd's opinion as to whether Mullenix should delay shooting at Leija's vehicle, at best, informs but does not decide whether Mullenix's use of force was objectively unreasonable in light of the risks posed by and to Leija. *See Scott*, 550 U.S. at 375 n.1 (observing that "[i]t is irrelevant to our analysis whether [the officer] had permission to take the precise actions he took" when he bumped the fleeing suspect off the road).

No. 13-10899

than with the 20/20 vision of hindsight." *Id*. at 396. In "weighing the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing" a suspect, a court must "take into account not only the number of lives at risk, but also their relative culpability." *Scott*, 550 U.S. at 384.

Applying these legal standards, and considering the facts as a whole, Mullenix's decision to fire at Leija's vehicle was not objectively unreasonable under the Fourth Amendment. As this court recognized in *Thompson*, a fleeing suspect's possession of a firearm presents an independent and grave risk to officers and civilians that may, under certain circumstances, justify firing at the suspect's vehicle, even when doing so poses a significant risk to the suspect's life. The plaintiffs in *Thompson* argued that the officer's actions were unreasonable because, at the time that the officer fired, the suspect "was driving on a 'lonely' rural road and his vehicle had already been disabled" by the shots that struck its radiator. 2014 WL 3882460, at *4. According to the plaintiffs, this showed that the "threat to the officers had already passed." *Id*. at *5. We rejected this argument in no uncertain terms, noting that it "presumes that [the suspect] was only a threat to the extent that the truck was operational," when, in fact, it was "undisputed that [the suspect] was in possession of a stolen firearm and that [the officer] was aware of that fact." *Id*. While we "assume[d] for the purposes of summary judgment that [the suspect] did not" actually intend to use the gun, we concluded that "[the officer] was justified in assuming that there was an ongoing 'threat of serious harm to the officer or others,' even if [the suspect]'s vehicle was already disabled." *Id*. (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 188 (5th Cir. 2011)).

Our analysis in *Thompson* compels a similar holding in this case. If anything, the objective threat that Leija would fire at officers or the public was

25

more serious than the threat posed by the suspect in *Thompson*. In *Thompson*, although there was a firearm in the suspect's vehicle, he never threatened to use it. *Id*. at *5. Here, however, Leija twice called the Tulia Police Dispatch on his cell phone, during the pursuit, stating that he had a gun and that he would use it to shoot any law enforcement officers he saw. This information was conveyed to the officers involved in the pursuit, including Mullenix. Mullenix was also aware that there were several officers setting up tire spikes at various locations along the interstate, and that there was a police vehicle, with its lights on, parked underneath the bridge from which he was planning to fire. Moreover, Leija was highly culpable for the risks he posed, a factor that *Scott* instructs us to consider. 550 U.S. at 384. Thus, even if the risk of serious injury Mullenix posed to Leija by shooting at his vehicle exceeded the risk of serious injury Leija posed to the officers in this case, Mullenix's actions would not have been unreasonable under the Fourth Amendment.

The majority attempts to distinguish *Thompson*, in part, by pointing to the threat, in that case, posed by the suspect's vehicle during the chase. But that argument is a non sequitur. In concluding, in *Thompson*, that the risk posed by the suspect's possession of a firearm justified the officer's decision to fire at it, we assumed that the vehicle was no longer operational. *Id*. at *5. The majority also points out that the suspect in *Thompson* was suicidal, had stolen a car, and had abducted a woman during the flight (who was released before he was shot). While these facts were, no doubt, relevant to our analysis of the risks in *Thompson*, it would be strange to conclude that the objective risk that Leija would use a gun was not equally great, given that Leija alone specifically indicated his intent to shoot at officers.

The majority further minimizes the risk that Leija posed to Ducheneaux and the other officers positioned along the road by citing several decisions in

which a suspect was on foot or in a stopped vehicle.[2]  *See, e.g.*, *Ballard v. Burton*, 444 F.3d 391, 402–03 (5th Cir. 2006).  In those cases, it was possible for the officers to observe the suspect's weapon, hands, or both, permitting the officers to react quickly before the suspect could use a weapon.  *Id.*  Here, however, Leija was traveling at high speeds and under cover of night, and Mullenix and the other officers could not see into Leija's vehicle.  The officers would not have been able to wait to shoot until after Leija raised his gun (which would not have been visible), without jeopardizing their own lives.  *See Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . . too late to take safety precautions." (internal quotation marks and citation omitted)).  Equally troubling is the majority's suggestion that, despite Leija's two statements to police dispatchers that he possessed a gun, a reasonable officer could not have concluded that he had a firearm because Leija was "not fleeing the scene of a violent crime" and "no weapon was ever seen."  The majority's suggestion eviscerates the Supreme Court's requirement that we adopt the perspective of a reasonable officer on the scene and refrain from viewing the facts with "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

---

[2] The majority also states that Mullenix "did not indicate that he perceived a threat to Ducheneaux from Leija" before firing at Leija's vehicle.  Mullenix's subjective perception of a threat, however, is not material to the objective reasonableness inquiry before us.  *See Ashcroft*, 131 S. Ct. at 2080.  Moreover, the majority is plainly incorrect on this point.  The record reflects that Mullenix's actions were motivated by his belief that Leija would fire his weapon.  Mullenix informed another officer over police radio that he was considering firing at Leija's vehicle because "this guy has a weapon and is willing to shoot."  The majority asserts that "there is no evidence that any other officer from any of the law enforcement agencies involved in the pursuit . . . decided to respond with deadly force."  The record shows, however, that Mullenix discussed his plan to shoot at Leija's vehicle with two other officers involved in the pursuit—Rodriguez and Shipman—neither of whom made any effort to dissuade him.

Additionally, while officers should use "non-lethal alternatives" to deadly force, when available, Mullenix reasonably believed that deploying tire spikes along the highway posed a significant risk of harm to officers, including Ducheneaux. Although the officers were trained to protect themselves, to the extent possible, when deploying and operating spikes, such protection was necessarily limited by the officers' need to position themselves near the roadway and to maintain visual contact with oncoming traffic, so that they could use a rope attached to the spikes to pull them in front of the approaching suspect vehicle and then out of the way of approaching police (here, Rodriguez) and other vehicles. There is no evidence suggesting that the officers deploying road spikes could position themselves in a manner that would eliminate their exposure to gunfire from passing vehicles.

The majority notes that, in *Thompson*, the officers tried several alternative methods to stop the chase before the officer shot and killed the suspect. 2014 WL 3882460, at *4, *6. Yet one of these "non-lethal methods," as the majority refers to them, involved an officer firing a shotgun at the suspect's truck tires while that vehicle was in motion. *Id*. at *6. It is hard to see how firing at a moving vehicle's tires is any less lethal than shooting at its engine block, given that both pose a substantial risk that the driver will be unintentionally struck by a bullet. Moreover, the fact that tire spikes twice failed to stop the suspect's truck in *Thompson* only adds to the evidence presented in this case that tire spikes are often ineffective. The Fourth Amendment does not require that an officer have chosen what, in hindsight, appears to be the best course of action—only that the officer's judgments be reasonable in light of the uncertainties inherent in police work. *See Graham*, 490 U.S. at 397. Here, an objectively reasonable officer could have concluded,

under the circumstances, that the risks posed to officers when deploying tire spikes outweighed their potential benefits.

I further question the majority's implication that Mullenix lacked sufficient knowledge to determine whether Ducheneaux was at risk. Mullenix knew that there was an officer below the bridge that he was standing on, that the officer's patrol lights were flashing (alerting Leija to the officer's presence), that the officer was likely operating tire spikes, and that officers operating spikes are often vulnerable to gunfire from passing vehicles. Mullenix also knew that tire spikes are not always effective in stopping vehicles and that there were additional officers located just minutes away along the highway. The risks at stake here were at least as particularized as in the Supreme Court's decisions in *Scott* and *Brosseau* and our decision in *Thompson*, where the officers employing force were not aware of the precise location or identity of the other officers and civilians they were acting to protect. *See Scott*, 550 U.S. at 384 ("[R]espondent posed an actual and imminent threat to the lives of any pedestrians who *might have been present*." (emphasis added)); *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (granting qualified immunity to an officer who fired at a driver who had not yet driven his car in a dangerous manner to prevent possible harm to "other officers on foot who [she] believed were in the immediate area . . . [and] any other citizens who might be in the area." (internal quotation marks and citation omitted)); *Thompson*, 2014 WL 3882460, at *5 (holding that it was sufficient for the officer to reasonably believe there "might be other travelers on the road," even though the officer was not "aware of their presence"); *see also Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 581 (5th Cir. 2009) (recognizing that "the holding of *Scott* was not dependent on the actual existence of bystanders—rather, the Court was also concerned about the safety of those who could have been harmed if the chase continued").

29

No. 13-10899

The majority also suggests that the harm Leija posed to the officers may have been insufficiently "immediate" to justify Mullenix's use of force. Yet it is difficult to conceive of a threat that is more immediate than the one Leija posed. At the moment Mullenix fired, Leija was seconds away from crossing the path of one of the officers he had threatened to shoot and minutes away from passing several other officers. *Cf. Thompson*, 2014 WL 3882460, at *6 (noting that, at the time point the officer fired at the suspect driver, the next town the driver would reach was "approximately a mile away").

Finally, the majority implies that because Mullenix's original intent was to strike the engine block of Leija's vehicle, the lack of evidence that shooting at an engine block is an effective method for disabling a car is somehow relevant. But "Fourth Amendment reasonableness is predominantly an objective inquiry" that "regulates conduct rather than thoughts." *Ashcroft*, 131 S. Ct. at 2080 (internal quotation marks and citation omitted). As the Supreme Court clarified in *Scott*, "in judging whether [an officer]'s actions were reasonable, we must consider the *risk* of bodily harm that [the officer]'s actions posed to [the suspect]." 550 U.S. at 383 (emphasis added); *see also id.* (explaining that the Fourth Amendment's objective reasonableness test does not depend on whether particular actions fall within the definition of "deadly force"); *Thompson*, 2014 WL 3882460, at *4 ("There is no doubt that firing the assault rifle directly into the truck created a significant—even certain—*risk* of critical injury to [the suspect]. Under these circumstances, however, the *risk* was outweighed by 'the extreme danger to human life posed by' reckless vehicular flight." (emphasis added) (citation omitted)). Mullenix's actions would not violate the Fourth Amendment as long as he reasonably believed that the *risks* posed by Leija, viewed in light of Leija's culpability for those *risks*, exceeded the *risk* of harm to Leija from shots fired in the direction of his

vehicle. *See Scott*, 550 U.S. at 383–84.[3]  In my view, Mullenix reasonably weighed these risks.

In conclusion, I recognize that this is a close case.  Whether Mullenix is entitled to qualified immunity is debatable.   Forced to decide, one or more of my colleagues in the majority might well conclude that Mullenix's actions violated clearly established Fourth Amendment law.  While that would not be my conclusion, it would nevertheless be a fair, responsible decision.  What we cannot do, on this record, is decline to decide the Fourth Amendment issue and, instead, effectively lateral that decision to a jury.  The ultimate issue of objective reasonableness is purely legal, and there are no genuine and material factual disputes preventing us from deciding that issue in this appeal.  For that reason, I dissent.

---

[3] It is worth noting that the probability of disabling Leija's car may not be as low as the plaintiffs and the district court presume.  In *Thompson*, although the suspect was travelling at high speeds, an officer positioned at the side of the road aimed at and successfully shot the radiator of the fleeing suspect's vehicle.  2014 WL 3882460, at *2.